IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| BRADY BENNETT, | § § § |
| Plaintiff, | § Case No. 1:23-cv-1050 § |
| v. | § § |
| NATIONAL INDIVIDUAL INSURANCE AGENCY, ENHANCE HEALTH LLC and ENHANCE IFP LLC, | § CLASS-ACTION COMPLAINT § § § DEMAND FOR JURY TRIAL |
| Defendants. | § § § |

## COMPLAINT

Plaintiff, Brady Bennett ("Bennett" or "Plaintiff"), by and through his attorneys, Kimmel & Silverman, PC., alleges the following against National Individual Insurance Agency LLC ("NIIA"), Enhance Health LLC ("Enhance Health") and Enhance IFP LLC ('Enhance IFP") (collectively Enhance Health and Enhance IFP are referred to as "the Enhance Parties") (collectively, NIIA and Enhance Health, Enhance IFP are referred to as "Defendants").

## INTRODUCTION

1. Plaintiff's Complaint is based on the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq*.

## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 386-87

1

(2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

3. This Court has general personal jurisdiction over each Defendant as each Defendant regularly and systematically conducts business in the State of Texas.

4. Furthermore, Defendants placed (directly and/or through their agent(s)) placed phone calls to Plaintiff at his "512" area code, associated with the Greater Austin region in Texas.

5. Defendants also placed phone calls from a number which appeared on Plaintiff's caller ID to be from various Texas area codes.

6. Plaintiff resided within this District at all times relevant hereto. Plaintiff received the calls at issue and experienced the associated harm within this District.

7. For those reasons, specific personal jurisdiction exists as to each Defendant.

8. Also for those reasons, venue is proper under 28 U.S.C. §§ 1391(b)(2).

## BACKGROUND

9. In 1991, Congress enacted the Telephone Consumer Protection Act ("TCPA") to protect consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing phone calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

10. The TCPA affords special protections for people who register their cell phone numbers on the National Do Not Call Registry. Specifically, the TCPA provides that each person who receives more than one call on their cell phone after being registered on the National Do Not Call Registry is entitled to recover a penalty of $500 per call, and potentially $1,500 per call if the calling party is determined to have willfully violated the TCPA. *See* 47 U.S.C. § 227(c) *et seq*.

11. From January 2022 until October 2022 alone, approximately 36.8 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com (last visited October 18, 2022). The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, The Wall Street Journal, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

## PARTIES

12. Bennett is a natural person residing in Cedar Park, Texas 78613.

13. Bennett is a "person" as that term is defined by 47 U.S.C. § 153(39).

14. Defendant NIIA is a business entity with a principal place of business, head office, or otherwise valid mailing address at 1900 Matlock Road Suite 500 Mansfield, Texas 76063.

15. NIIA a "person" as that term is defined by 47 U.S.C. § 153(39).

16. Enhance Health is a business entity with a principal place of business, head office, or otherwise valid mailing address at 1550 Sawgrass Corporate Pkwy, Sunrise, Florida 33323.

17. Enhance Health can be served through its registered agent Corporation Service Company 1201 Hays St., Tallahassee, Florida 32301.

18. Enhance Health is a "person" as that term is defined by 47 U.S.C. § 153(39).

19. Enhance IFP is a business entity with a principal place of business, head office, or otherwise valid mailing address at 1550 Sawgrass Corporate Pkwy, Sunrise, Florida 33323.

20. Enhance IFP can be served through its registered agent Corporation Service Company 1201 Hays St., Tallahassee, Florida 32301.

21. Enhance IFP is a "person" as that term is defined by 47 U.S.C. § 153(39).

22. At all times relevant to this action, Enhance Health and Enhance IFP worked in concert as a joint enterprise.

23. Each Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, trustees, sureties, subrogees, and/or representatives.

## FACTUAL ALLEGATIONS

24. At all times relevant hereto, Bennett owned a cellular telephone with the number (512) XXX-5325.

25. Bennett registered his cell phone with the Do Not Call Registry on November 20, 2008, in order to obtain solitude from unwanted telemarketing calls.

26. To solicit its health insurance, each Defendant hired American Health Care Management, Inc.[1] ("AHCMI") to engage in telemarketing operations on its behalf.

27. Plaintiff did not ever provide express written consent, or otherwise consent in any manner, to receive telemarketing calls from AHCMI, or on behalf of NIIA, Enhance Health or Enhance IFP.

### Campaign 1: AHCMI on behalf of NIIA

28. Nonetheless, in or around March 16, 2020, AHCMI commenced its campaign of calls to Bennett, soliciting its health insurance plans on behalf of and for the benefit NIIA.

---

[1] American Healthcare Marketing Inc. has filed for bankruptcy.

4

29. At the start of each call, after Plaintiff answered, the following prerecorded message played:

> Hello, this is 2020 Healthcare Central. We looked through our records and noticed you submitted a request in the past for some information regarding more affordable health insurance policy. This is a follow up and we would love to hop on a call to see if we can discuss some options.

30. The statement in the message that Bennett "submitted a request" for telemarketing calls about health, was false, as Bennett never submitted any such request.

31. The pre-recorded message would then list either 844-989-1702 or 833-551-0677 as a number to call should Plaintiff want to "opt out" and be placed on their internal Do Not Call list.

32. Bennett correctly intuited that 'Healthcare Central" was a generic alias, rather than a true corporate name.

33. Bennett also knew the messages were pre-recorded as they sounded robotic, non-interactive and each message was identical or almost identical in language, tone and inflection.

34. Also, the statement suggesting Bennett "hop on a call" carries the necessary implication Bennett was not "on a call" with a live person while listening to the message at the commencement of the call.

35. Plaintiff followed the instructions from the pre-recorded messages and called 833-551-0677 to opt out and be placed on the calling party's Do Not Call list permanently with no avail.

36. After receiving several identical calls, on May 22, 2020, Plaintiff finally stayed on the line, the call was transferred to a live agent. Plaintiff then engaged with the call to learn the identity of the company calling; Plaintiff spoke with "Gregory Mason" of AHCMI who tried to

5

sell Plaintiff health insurance but initially would not disclose the true name of the company on whose behalf he was calling.[2]

37. For the purpose of compiling evidence, Plaintiff provided his email address, and while he still on the phone with Gregory Mason he received an email from memberservices@ahcminc.com.

38. The message included in the body of the email the language "National Individual Insurance Agency is a Texas-based insurance agency that provides comprehensive benefits administration and management services to agents…"

39. The email went on to read "ACHM provides customer services and fulfillment services to… National Individual Insurance Agency (NIIA)..." A true and correct copy of the an image from that email is copied below:

> By signing below, I confirm the following:
> National Individual Insurance Agency (NIIA) is a Texas-based insurance agency that provides comprehensive benefits administration and management services to agents, associations and carriers nationwide. Our licensed internal agents, and the licensed third-party call center agents who contract with us, sell various insurance and non-insurance products to consumers ("Members") throughout the United States.
> Association Health Care Management, Inc. (AHCM) is a licensed TPA who provides management services to organizations, agencies and other TPAs. AHCM provides customer service and fulfillment services to National Association of Preferred Providers (NAPP), National Individual Insurance Agency (NIIA) and Premier Health Solutions (PHS). AHCM, NAPP, NIIA and PHS are separate legal entities and have sole financial responsibilities for their own products and services.

40. Accordingly, Plaintiff understands the subjects calls were made by AHCMI on behalf of NIIA, in connection with the contractual relationship between AHCMI and NIIA.

41. Furthermore, the fact that an AHCMI employee sent an email with an NIIA contract indicates AHCMI had the authority to bind NIIA to contracts.

42. Once Plaintiff was able to determine the calling party's corporate identity, he immediately advised the caller he was no longer interested in purchasing its plan and directed AHCMI to cease the calls made on behalf of NIIA.

---

[2] Again, Plaintiff correctly inferred "Healthcare Central" was a generic alias rather than a true corporate name.

43. The calls were "solicitations" as defined by the TCPA, as they were made in furtherance of the objective of selling health insurance policies.

44. A non-exhaustive list of calls on behalf of NIIA containing pre-recorded messages in that campaign are as follows:

| Date and Time of Call | Calling Party's Number Reflected on Caller ID |
|---|---|
| March 16, 2020 at 10:34 AM | 985-314-3556 |
| March 25, 2020 at 4:02 PM | 262-295-6392 |
| April 7, 2020 at 9:21 AM | 256-371-8998 |
| May 5, 2020 at 2:27 PM | 706-388-3727 |
| May 7, 2020 at 2:31 PM | 920-283-2378 |
| May 8, 2020 at 3:02 PM | 757-260-3818 |
| May 13, 2020 at 2:57 PM | 380-235-0569 |
| May 15, 2020 at 11:44 AM | 860-238-3446 |
| May 18, 2020 at 2:37 PM | 562-378-5767 |
| May 19, 2020 at 1:29 PM | 458-757-4911 |
| May 20, 2020 at 10:32 AM | 424-323-4336 |
| May 22, 2020 at 3:46 PM | 601-419-9622 |
| May 27, 2020 at 3:27 PM | 248-653-5344 |
| May 28, 2020 at 4:18 PM | 267-352-9242 |
| May 29, 2020 at 9:49 AM | 563-287-3182 |
| June 5, 2020 at 9:47 AM | 513-496-3943 |
| June 15, 2020 at 4:05 PM | 240-915-6224 |

45. Defendant knew or should have known its calls were unwanted by Plaintiff's registration of his number on the Do Not Call registry, as well as his input to the NIIA's Do Not Call List while receiving their calls that the calls were unlawful and unwanted.

46. Plaintiff found the calls to be irritating, disruptive and invasive.

**Campaign 2: AHCMI on Behalf of Enhance Health and Enhance IFP**

47. During the aforementioned telemarketing campaign, Bennett repeatedly communicated to AHCMI that the calls were unwanted.

48. Nonetheless, in or around September 22, 2022, AHCMI commenced *another* campaign of calls to Bennett, soliciting its health insurance plans.

49. That campaign (which occurred in late 2022 through early 2023) was at the direction of, and on behalf of the Enhance Parties.

50. In each of the calls, the agents used similar scripts and attempted to solicit healthcare plans Bennett did not want or need.

51. On or around December 1, 2022, Bennett stayed on the line and engaged with the calling party in order to ascertain who was calling. The calling party disclosed s/he was with AHCMI and then transferred Bennett to another agent.

52. That agent identified himself as "Gregory Telasco", who Plaintiff has learned was working for the Enhanced Parties.

53. The agent sent a confirming email, copied on the following page:

///

**From:** Team BenefitAlign <noreply@benefitalign.com>
**Sent:** Thursday, December 1, 2022 4:54 PM
**To:** bennett.home.014@outlook.com <bennett.home.014@outlook.com>
**Subject:** Enhance IFP LLC Plan details



Hi Customer,

Thank you for choosing Enhance IFP LLC for your insurance needs.

To start taking advantage of the plan benefits, please select the plan that meets your needs andcomplete your enrollment. The attached document has the details of your selected plan.

Sincerely,

Team Enhance IFP
LLC(844) 214-8372

54. Bennett received numerous other healthcare related telemarketing calls in which the agents used similar scripts, had sales pitches that were almost identical and had common syntax as the December 1, 2022 call described above.

55. Plaintiff received calls on behalf of the Enhanced Parties, on instances including but not limited to the following:

| Date and Time of Call | Calling Party's Number Reflected on Bennett's Caller ID |
|---|---|
| 9/22/2022 4:35 PM | 631-248-3934 |
| 9/28/2022 12:21 PM | 331-261-6382 |
| 10/20/2022 2:26 PM | 605-307-7015 |
| 10/25/2022 11:21 AM | 657-225-1600 |
| 10/25/2022 3:31 PM | 339-330-1501 |
| 10/26/2022 11:01 AM | 725-720-2736 |
| 11/1/2022 1:25 PM | 224-252-9979 |
| 11/1/2022 2:20 PM | 276-246-5109 |

| | |
|---|---|
| 11/11/2022 10:43 AM | 501-330-5175 |
| 11/16/2022 12:08 PM | 219-351-1157 |
| 12/1/2022 4:34 PM | 580-257-6982 |
| 12/2/2022 9:20 AM | 254-324-4663 |
| 12/2/2022 9:55 AM | 341-234-8823 |
| 1/3/2023 3:57 PM | 980-206-1801 |
| 1/10/2023 11:35 AM | 313-710-1319 |
| 1/12/2023 8:43 AM | 839-213-4132 |
| 1/13/2023 9:53 AM | 808-556-3223 |
| 1/13/2023 3:44 PM | 334-402-5855 |
| 2/8/2023 4:08 PM | 269-558-9402 |
| 2/10/2023 9:49 AM | 504-681-9520 |

56. Defendants' calls were not made for "emergency purposes."

57. Plaintiff repeatedly told Defendants to stop calling.

58. Nonetheless, Defendants, through their agent, continued to call repeatedly.

59. Defendants' calls were bothersome, disruptive and annoying to Plaintiff.

**Vicarious Liability Under the TCPA**

60. On May 9, 2013, the FCC adopted the long-standing principle that a business cannot avoid liability by outsourcing responsibilities to ostensibly independent third-parties, to apply to "sellers" who hire "telemarketers" to solicit the seller's products:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that

physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC*, 28 FCC Rcd 6574 at 6588 (F.C.C. May 9, 2013) (internal citations omitted).

61. Moreover, the 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*., at 6587 n. 107.

62. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id*., at 6593.

63. Upon information and belief, NIIA and theEnhanced Parties entered into contract for services with AHCMI. Through that contract, NIIA and the Enhanced Parties agreed to pay AHCMI based on the number of "leads" AHCMI generated for NIAA/Enhanced Parties.

64. In those contracts the Defendants retained the ability to substantially control the marketing activities of AHCMI.

65. Because Defendants had the ability to control AHCMI's activities and AHCMI was acting to benefit the Defendants financially, an agency relationship exists.

66. Accordingly, the violations of AHCMI in the course of marketing for each Defendant can reasonably be imputed to each Defendant under the theory of "actual authority" or a traditional agency relationship.

67. Furthermore, given the widespread and pervasive TCPA violations in messages healthcare marketing, Defendants each had reason to carefully scrutinize the marketing activities of AHCMI, while marketing on their behalf.

68. By accepting "leads" that came by way of AHMCI's unlawful telemarketing, where Defendants had reason to know of the violations, Defendants ratified AHCMI's TCPA violations.

69. Upon information and belief, Defendants hired, encouraged, permitted, and enjoyed the benefits of mass spam-marketing by AHCMI.

70. Defendants are not permitted under the law to outsource and contract their way out of liability by directing and benefitting from AHCMI's TCPA violations.

71. For the calls in the first campaign identified above, NIIA is vicariously liable.

72. For the calls in the second campaign identified above, the Enhanced Parties are vicariously liable.

73. Alternatively, to the extent any Defendant placed any of the aforementioned calls directly, said Defendant would be directly liable for such violation.

### COUNT I
### PRE-RECORDED MESSAGES TO A CELL PHONE
### IN VIOLATION OF 47 U.S.C. §227(b)(1)
### *(Plaintiff v NIAA)*

74. Bennett incorporates the forgoing paragraphs as though the same were set forth at length herein.

75. Relevant to this count, 47 U.S.C. § 227(b)(1) of the TCPA states:

> "It shall be unlawful . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using [a] prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone"

76. The Federal Communications Commission's regulations implementing the TCPA provide that telephone solicitations cannot be made to a recipient without the recipient's "prior express written consent." *See* FCC 12-21, CG Docket 02-278 (effective October 16, 2013); 47 C.F.R. § 64.1200(a)(2).

77. The term "prior express written consent" as defined by the Code of Federal Regulations means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8)(i).

78. By placing prerecorded voice calls to Bennett's cell phone, NIAA without express written consent, NIAA violated 47 U.S.C. § 227(b)(1).

79. The violations were willful, intentional and made in reckless disregard of the TCPA.

80. As a result of the above violations of the TCPA, Plaintiff incurred damages as set forth above entitling Plaintiff to an award of statutory, actual and treble damages.

**COUNT II**
**VIOLATION OF THE FEDERAL DO-NOT-CALL RULES:**
**47 U.S.C. § 227(c)(5) and 47 C.F.R. § 64.1200(c)**
*(Plaintiff v. All Defendants)*

81. Plaintiff incorporates the forgoing paragraphs as though the same were set forth at length herein.

82. The TCPA prohibits any person or entity of initiating any telephone solicitation to a residential telephone subscriber who has registered his or his telephone number on the National Do-Not-Call Registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. 47 U.S.C. § 227(c).

83. Defendant called Plaintiff for solicitation purposes despite the fact his number had been on the Do Not Call Registry since November of 2008.

84. Defendant called Plaintiff on multiple occasions during a single calendar year despite Plaintiff's registration on the Do Not Call list.

85. Defendant's acts as described above were done with malicious, intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of harassing Plaintiff.

86. The acts and/or omissions of Defendant were done unfairly, unlawfully, intentionally, and absent bona fide error or good faith mistake.

87. As a result of the above violations of the TCPA, Plaintiff incurred damages as set forth above entitling Plaintiff to an award of statutory, actual and treble damages.

**Wherefore**, Plaintiff, **Brady Bennett,** respectfully prays for judgment as follows:

a. Statutory damages of $500.00 per violative telephone call as provided under 47 U.S.C. § 227(b)(1)(B);

b. Treble damages of $1,500.00 per violative telephone call, as provided under 47 U.S.C. § 227(b)(1)(C);

c. Statutory damages of $500.00 per violative telephone call (as provided under 47 U.S.C. § 227(c)(5)(B);

  d. Treble damages of $1,500.00 per violative telephone call, as provided under 47 U.S.C. § 227(c)(5)(C);

  e. Injunctive relief, as provided under 47 U.S.C. § 227(b) and (c);and

  f. Any other relief this Honorable Court deems appropriate.

## DEMAND FOR JURY TRIAL

**Please take notice** that Plaintiff, **Brady Bennett**, demands a jury trial in this case.

              Respectfully submitted,

Dated: September 5, 2023     By: */s/ Jacob U. Ginsburg*
                Jacob U. Ginsburg, Esq.
                Kimmel & Silverman, P.C.
                30 East Butler Pike
                Ambler, PA 19002
                Phone: (267) 468-5374
                Facsimile: (877) 788-2864
                Email: jginsburg@creditlaw.com
                teamkimmel@creditlaw.com